Case 25-1537, USA et al. v. City of Detroit MI, Oral Argument, 15 minutes per side. Mr. Stemping for the appellate. Good morning, your honors. Eric Stemping appearing on behalf of the appellants, who are the relators in the underlying False Claims Act case. I've asked to reserve three minutes for rebuttal purposes. There are three bases that we see for reversal in this case. The first one is the procedural pleading requirements issue that relates to a separate subsection of the False Claims Act. Is that about amending the complaint? Alternatively, our argument is that we did plead it, it just was taken out of the title. This is subsection A versus subsection B, right? Correct. That is correct. It was a pretty good head fake on the other side to take out the title. You were trying to still assert the claim. I will say I was not the attorney on it at the time. That second amended complaint was actually filed before us. Why isn't that just squarely in the district court's discretion in managing and policing the case? Because the case law in this court is very clear that we looked at the substance of the complaint, not the title. In context, they had pretty good reason to think that that wasn't in the case anymore. It was fully explored in discovery and it was fully briefed by the defendant in the summary judgment motions. They addressed it. They understood what the claim was. The language itself of the statute is directly in the complaint. They were on notice of it and under Rule 8, it is just a plain statement of what the claims are. The district court didn't think so, I guess. I understand your argument. As far as absent, effectively being in the case all along, the idea that your client could amend at the point you are talking about in the case, way past the scheduling order. We are talking Rule 16 again. We are talking about the rules again. You have to show good cause for amendment after the date set in the scheduling order by the district court. I don't see anything like that unless I'm overlooking it here. The only quibble I have with that is that the case law does provide that. It's actually a very liberal standard for allowing amendment of the complaint. It's not liberal at all after the deadline set in the scheduling order. I mean, see in Ray the opiate case, which Judge Boggs is citing his opinions. That's one of mine. It's liberal before and you get one liberal amendment. And then after, no, it's not liberal at all. This is not essential to our case. Let me back up from that, though, because even under the A1A argument, we've still made a prima facie case. We still see tribal issues under the section that we were... What do you think they are? The first one is that the district court's ruling was that statements that were in these certifications and assurances, which is the statement that the director of the Department of Transportation signs and presents to the Federal Transit Administration in order to obtain the funds from the government. I mean, that's a required document. They do provide in there. Now, that document changed over time. So before 2019, the statement was that they... It says that the applicant agrees to comply with all federal rules, regulations, statutes, and guidance. And then the subsequent change in 2019 is that the defendant in this case was certifying that its procurement system complies with, in a present tense, complies with the federal rules, regulations, and guidance that's provided to it. Clearly a present tense statement, no question about it. The district court, for some reason, just never analyzed that particular language in detail and just simply said these were all promises of future conduct and then relied on an Illinois district court to say promises of future conduct are not, in fact, actionable under the False Claims Act. Are you challenging the district court's determination as to the part that was, by its terms, pointing toward the future? Yes. You are challenging that? That's the handout case that we cite from the Ninth Circuit. I mean, it's a representation of what will happen in the future. How can that certification be fraudulent at the time? Because they're saying we agree now. If it agrees, it's a present tense. So you say in 2019 it changes. Correct. Right? But your claims also include a period before then, or am I wrong? No, you're correct. Okay, and my point is before then, it was, by its terms, a representation about future facts. And so why isn't, I mean, it would seem the district court was correct to say that's not fraudulent. It's a representation about the future, and it's not contrary to any existing fact now. I disagree because I think you have to parse the exact language that was in there. And what the language says is that the applicant agrees to comply with federal regulations. Agrees is a present tense, so I'm agreeing right now to comply with them. But do you allege any malefaction on their part after 2019? Yes. Which is what? Which is the fact that they are certifying that they are working with a responsible contractor. No, but in terms of the things that they did, in other words, if you sign something false but don't make any claims after that, then you don't have a case, do you? Correct. But they were continuing to get FTA money in drawing down all of these grants all the way through 2022, which is when our analysis on the case ended. They're continuing to receive FTA money. Funded by the FTA? I thought that after March of 2018, they were no longer getting funds from FTA. They were continuing to operate, but they were no longer getting federal funds. Am I wrong about that? That's incorrect. Sorry? That is incorrect. They were continuing to get FTA funds after 2018. What happened in 2018 was they stopped falsifying their on-time percentage reports after 2018. And that's what the defendant is referring to in their brief, is that after March of 2018, there's a two-year period of time where— So they weren't, in fact, certifying, sending the reports? Something happened there in 2018, 2019. So clarify for me what it is that something else changed on that end of it. As I understand the defendant's argument, what they're saying is that in 2018— Our evidence shows that from 2016 to 2018, TransDev, the contractor, was presenting these false reports about on-time percentages and their performance metrics. There was a question about where those reports went, but clearly there were reports.  Got it. And then in 2019 is when the language changes on the certification form to this present tense language from— All right, that I understand. And so that's what changed, not that it wasn't FTA money. So you're saying the reports were exactly the same after 2019? They went to exactly the same people? They did not, no. The reports were no longer falsified after 2018. Okay. The facts show that. That's what the documents and the evidence that we produced in this case definitely show, that that's correct. That's a factually true statement. However, there's more than just— Those on-time reports, as the defendant points out, aren't directly presented to the FTA. It's not a direct requirement for them to get the money. It's not a direct requirement on their side, though. Yeah, I'm saying, so let's credit you that it's important about these reports, but as you seem to be saying is you agree that they're no longer submitting the reports anywhere. Is that right? Correct. March of 2018. Okay. Now we're on the same page. Okay, perfect. But in April of 2018, TransDev had started complying with the 30-minute requirement. Isn't that right? Well, they stopped falsifying records. Whether they complied with the 30-minute requirement is a different story, because that's not necessarily fraud to not comply. That might be a breach of contract. I thought that they—I mean, before they were saying, we'll pick people up within 40 minutes, right? They changed the parameters. Okay, so to back up. So the way the system works is there's a requirement by the FTA that there's a 30-minute pickup window, 15 minutes before to 15 minutes after the time that they give. There's a company that tracks that. They have computer systems, right? And that's called Ecolane. And Ecolane tracks what the projected pickup time was versus the actual pickup time. And then it creates these reports. And the user of the report, though, can manipulate those pickup windows so that if you use a 30-minute window, it might show a certain on-time percentage. But if you physically go in and change it to be a 40-minute window, now your percentage is going to look a lot better. So they were using—Transdev was using a 40-minute window before April 2018. Is that right? Correct, yes. Okay, but then they start using the 30-minute window in April 2018. Is that right? Correct, yes. And so, like, where's the fraud then? Because the city has other requirements that it has to meet with the FTA. So you're not griping about the 30-minute requirement after 2008? I'm sorry, I shouldn't use the word gripe. I know, I understand. So you're not complaining, though, about the 30-minute requirement? Okay. Okay, what happens after 2018, though, is they are continuing to have to certify every year that they are giving their contracts to a responsible contractor. That is required by the FTA Master Agreement, and it's required by the federal regulations. We cited both of them in our brief. And it defines what a responsible contractor is, which includes past performance and also includes integrity. So they are giving Transdev full points for those categories. They gave them 40 out of 40 or 20 out of 20 on each of those categories. So it's like the past, you know, misrepresentations in your view, like, you know, they forever taint this entity, and even though they're complying with the substantive requirements, they don't pass, like, an integrity test because of what they did in the past. Yeah, they're telling the federal government this is a good contractor that has a lot of integrity. They have the highest level of integrity. I mean, there's redemption in all things in life, isn't there? They fixed it. But they were doing that before 2018 as well, Judge. I mean, they were also before then saying this is a fully integrity-based contractor. Why? And they just continued to do it. Let's see if Judge Seiler has – do you have any questions, Judge Seiler, at this point? No questions, Judge. Okay. Thank you, Judge. Okay. Thank you. We'll hear – now or later? It's up to you. Bring it up or not? Later. Later. Okay, fine. That's fine. I agree. I agree. I just wanted to – Good morning, Your Honors. Eric Gabo, appearing on behalf of the Appalachian City of Detroit. I'd like to start by addressing some of the issues that the other side mentioned and then go on to my regular presentation that I had planned to give. In regard to the argument that the district court failed to allow them to amend a state of claim under Section 3729A1B, we agree with, I think, the questions of the court that this is a very difficult standard to meet for the appellant. But more importantly, even if they had either stated a claim under that section or had been allowed to amend their complaint to do so, this wouldn't make any difference because the entire reasoning for that subpart B is simply to allow liability under the False Claims Act to attach to third parties who create a document that is then used by someone else to submit to the federal government. So there's no third party here. There's only one defendant, the City of Detroit. So it wouldn't have made a difference. And for all the other reasons that we state in our brief, I mean, there's no violation of federal law. There's no knowing violation. There's no materiality. So that argument goes nowhere. They claim that there's a triable issue of fact, even if their complaint is just limited to 3729A1A, because they bring to the court's attention a 2019 certification that, in one sentence of that, it talked about present compliance rather than future compliance. The problem with that argument, there's several problems. First of all, the nature of their claim is defined by their pleadings, not by some document they produced years after the pleadings had started. Their complaint states that these certifications were improper because they stated the city would comply in the future. That's their complaint. Now they come years later and say, well, wait a second. No, we found some document that has language of present compliance. Well, they didn't amend their complaint to make that claim. So they're locked into the actual allegations that they made in their complaint. But by 2019, even if we're talking about present compliance, by that point, as your judges elicited from the other side, all of the reports are sent in using 30-minute windows. In other words, even if that is a violation, which it isn't, that is corrected by 2019. So if Director Dan Dirks and other directors submit certifications saying we are presently in compliance, they were. There's no issue on on-time reports at that point. There's no issue with regard to this phone call that happened four or five years earlier at that point. So that doesn't really matter. Plaintiff also, I think, misrepresents exactly how the scheduling occurred. They talked about what was called the Ecolane system. This is a system that not only is used for scheduling, but is used to run reports. But the key point that I want to make is these are completely different functions. They're different parts of the Ecolane system. They're done by different people. The people who do the scheduling are not even in the same building as the people that were running the reports. And this is the point that we make in the brief that why we say that regardless of how they completed their reports, that isn't a violation of federal law. As we state in our brief, there's no federal statute, regulation, or guideline that even requires a transportation system to calculate on-time percentages. There's no federal statute, regulation, or guideline that dictates how one must calculate on-time performance. There's no federal minimum on-time standard that must be met. And the FTA doesn't even track this. Even if a transportation system keeps these statistics, that is not sent to the FTA. The FTA does not monitor this. Now, the plaintiffs say, well, no, there's this circular that imposes a 30-minute window. But the problem, again, is they're confusing scheduling with later running on-time reports. What the federal circular talks about is, well, let me just back up and explain how the scheduling works. When a rider calls for a ride, they talk with someone in scheduling, not with Marty Moore, not with people running on-time reports. They talk with them. They negotiate a time. At that point, they are told, here's the window. It's 30 minutes. So if you want 9 o'clock, you've got to be ready 845 to 915. That's the time when they expect to be outside to make sure they don't miss their ride. That's the time that the transportation providers are told to be there and that they're shooting for. Now, after the ride comes and is picked up or not picked up, another section of TransDev, using a different part of the Equal Lane System, then runs on-time reports. But that has nothing to do with the window that that rider was told to wait. It has nothing to do with that. What does this bear on? Pardon me? I mean, what issue in the legal issue does this relate to? Well, there's no violation about using 40-minute windows in calculating on-time performance because the federal government says nothing about that. All they talk about is we believe that when you're setting up rides, you should tell the rider that there's a 30-minute window because we don't want people waiting. Can't you infer that that's when the provider is supposed to be there for purposes of the federal requirements? Well, but there's no requirement. I think that's quite a leap to say that there's some federal requirement that you need to do that. Well, if the feds say schedule it within a 30-minute window, it kind of suggests that that's when the person is supposed to be picked up, right? It's not a real tenuous inference, isn't it? Well, but it doesn't address the issue. The issue is how long were they waiting? How long were they told to be outside? It's after the fact. For example, well, let me just – Well, I don't know how useful this is, frankly, but let's – Judge Seiler, do you have any questions? No, I do not. Okay. I mean, this point I think we've heard plenty on, unless Judge Poggs feels otherwise. No, I'm good. Another point I'd like to go into is the argument that the city – they repeatedly say that the director, Dan Dirks, and others knew that there were violations or that they did not properly investigate these violations. But the testimony in the case was unequivocal, that Mr. Dirks, the other people at the Department of Transportation, the people that he relied on, didn't know about these things. They didn't see that these reports had a different time period on them, that they were calculated with 40-minute intervals. So to establish any False Claims Act violation, they would have to show, one, that the city knowingly presented a false and fraudulent claim to the government. Two – well, first, that there was some violation. Secondly, that they knowingly did this. And three, that there's materiality. Yeah. To show knowingly presented a claim, they have to show actual knowledge, acting in deliberate ignorance of the truth, or acting in reckless disregard of the truth. There's no evidence that any of these were met here. First of all, all the city employees testified that they weren't aware of these violations, so there's no actual knowledge. They didn't act in deliberate ignorance or reckless disregard of the truth, either, because everyone who signed those certifications either testified or produced declarations that they had regular meetings with their staff to talk about all these issues, and no one raised this. And like any high-ranking official, they have the right to delegate these things to other people. They don't have time to look into all the minutiae of things. It's important also to note that this involves the Detroit Department of Transportation, which is one of the largest city departments. There are thousands of employees. There are multiple programs that have nothing to do with either paratransit or related programs. In fact, even as to these programs that are at issue in this case, the on-time reports were just a very small part of what Mr. Dirks and the other people at the department were reviewing. As we set forth in a document that was produced at the trial court level, ECF number 104-4, at all of these regular meetings, Mr. Dirks and the other members of the Department of Transportation were looking at things like productivity, riders per hour, the trip lengths, the number of complaints that were made by riders, the safety performance, the equipment reliability, the call length in scheduling the trips, the negotiation of trip effectiveness. My point is this is one small thing that they're looking at in the context of the paratransit or the new freedom. In fact, even those were dwarfed by the other aspects of the department's operations, which were normal bus operations. Is it surprising that they may have missed something like this? I don't think so, with all the things that they had to look at. In fact, some of these same reports were part of the other case we mentioned, the racial discrimination case, which I was defending. I looked at those, and for years I never saw any issue with the difference between a 20-minute window, a 40-minute window, whatever, and no one raised those there. So is it surprising that no one saw this? I don't think so. That isn't evidence of fraud. Okay. Well, I mean, do you have any further questions, Andy? No, we're good. All right. I don't think we have any questions remaining. Judge Seiler, any questions? All right. Could I just make one more comment on the materiality issue? I'm surprised that the plaintiffs continually miscite the facts on the enforcement history of the FTA. In fact, this is one of the weakest parts of their whole claim. Again, even assuming that they properly alleged the elements of a False Claims Act violation, they have to show that if the federal government had been aware of this, they would have taken the money back or had other extreme consequences to the city. Now, the plaintiffs state that back in 2012, 2013, the city had a review by the federal government, which was perhaps the worst in history. There are hundreds of serious violations admitted by the city, violations of federal law. In fact, there was $46 million in questionable expenses. And what did the FTA do at that point? How much did it demand back? Zero.  So if they didn't take any of that money back at that time, why is it that now when plaintiff raises allegations about a phone call in 2015 or some reports that used a 40-minute window, which again is not a violation of any federal law, why then would the federal government demand a return of all of this money? We're not talking a trivial amount. This is $16 million relating to 17 different contracts. We've only been talking about a couple of contracts, but there were like 17 different contracts that were at issue here. Okay. Yeah. All right. I think we understand that point. Thank you. Okay. Thank you for your argument. We'll hear a rebuttal. Thank you, Judge. Touching on the scienter and the materiality arguments that were just raised by the defendant, because we didn't get into that on my main argument. So with regard to scienter and whether or not these individuals in the Department of Transportation had the appropriate knowledge is easily shown because they were getting these reports on a weekly basis, 133 reports showing the falsified pickup window and inflated performance. And this court has addressed this issue directly in the Chesborough case. Chesborough? Yeah, which would be the – when I say this directly. All right. I don't mean factually directly. I mean legally directly in that you can't close your eyes and pretend it's not there. That leads to another issue, which is actually separate from the merits in this case. Okay. Which is that your briefs in any number of instances cite cases that do not exist. There's no such case for many of these. Yes. Or give us quotes about the law of the circuit, in quotes, that do not exist, such as Chesborough. You say on page 7 of your reply that this court has recognized that deliberate interest or ignorance satisfies scienter when the defendant has obvious reasons to investigate but choose not to. Chesborough, 655 at 473. The word obvious is not there. The case does not talk about deliberate ignorance. Okay. We've got, I don't know, close to a dozen of these in the two briefs. And so what happened here? I apologize, Judge. Are we reading a chat GPT brief? I don't want to put blame anywhere but on myself. I don't know. It was farmed out, but I don't want to say anything about what I did. You know, this is on me. And I apologize, no matter who actually did the draft, you know, how it happened, it's on me. And I seriously apologize to the court for that. Well, I mean, this is serious stuff. It is. We just had an order come out yesterday, I think, for a lawyer. I know. We're in big trouble for this exact stuff. So we're not going to resolve this in the courtroom, and I don't want to, like, ruin your next, you know, several days. But we're going to give you an opportunity to respond. We're going to lay out what the problem is, okay? And, you know, I mean, nobody's perfect, and we all make mistakes, but this stuff can't happen and waste their time, waste our time, maybe even lead us, we read everything, you know, so I don't think it's actually going to lead us astray. But this is serious stuff, and we're going to give you a chance to respond, and we'll go from there. Completely unacceptable, and I will accept whatever consequences come as a result of it, Judge. Well, that's, you know, I don't doubt your sincerity, Mr. Stempien, as you say that, okay? I don't. And that's, you know, that's significant. But so is this. Do you have anything, Judge Box? I would only add, perhaps, because I've followed CHAT GPT since it came out, just as an avocation, and then looking at the legal cases that have been coming out all over is, as Judge, everything that Judge Kethledge just said is correct, but the cases where the people really get in trouble is where they're not straight with us after they investigate how it happened and don't tell us exactly correctly how it happened. I assure you that will not happen with me.  I will be very forthright with the court about how this happened. How did this happen? And I will ensure I put in systems in place in the future so it won't happen again. Okay.  Well, I, you know, I find you credible in your sincerity, but you have a problem.  And we're going to be looking for an explanation. Thank you, Judge. I appreciate you saying this at the end and not the beginning of the argument. Yeah, I didn't want to blow things up, but, you know, when you cited one of the cases, that was... Yeah, it was... Okay. Thank you, Judge. All right. Case to be submitted. The clerk may adjourn court.